92 P.3d 526

**LEXINGTON HEIGHTS DEVELOPMENT, LLC, a limited liability company, Plaintiff–Appellant,**

v.

**Roger C. CRANDLEMIRE and Elizabeth Crandlemire, husband and wife; Blake Mayes, a single man; Corporations 1–5 and Does 1–10, Defendants–Respondents.**

**Roger C. Crandlemire and Elizabeth Crandlemire, husband and wife, Defendants–Counterclaimants–Respondents,**

v.

**Lexington Heights Development, LLC, a limited liability company, Plaintiff–Counterdefendant–Appellant.**

### No. 29479.

Supreme Court of Idaho,
Boise, May 2004 Term.

May 27, 2004.

Givens Pursley, LLP, Boise, for appellant. David R. Lombardi argued.

Eberle, Berlin, Kading, Turnbow & McKlveen, Chtd., Boise, for respondents Roger and Elizabeth Crandlemire. Warren E. Jones argued.

Law Office of G. Lance Salladay, Boise, for respondent Blake Mayes. G. Lance Salladay argued.

EISMANN, Justice.

This is an appeal from a partial summary judgment holding that a real estate contract is invalid because it did not contain a sufficient description of the property being sold. We affirm the partial summary judgment.

## I. FACTS AND PROCEDURAL HISTORY

The respondents Roger and Elizabeth Crandlemire (the Crandlemires) owned a 95–acre parcel of real property, and on February 17, 1999, they entered into a contract to sell approximately ninety acres of that property to appellant, Lexington Heights Development, LLC, (Lexington Heights). The contract described the property being sold as "the real property situated in Ada County, Idaho located at 1400 West Floating Feather Road, consisting of approximately ninety (90) acres ..., however excluding the residential dwelling (which will include no more than five acres) and improvements identified below (herein called 'Premises')." The contract provided that the "the precise size, location, dimensions and configuration" of the five-acre parcel excluded from the sale would be determined as follows:

A precise legal description of the Premises will be prepared as a result of an ALTA survey to be obtained by Seller. It is understood and agreed that Seller may sell to a third party the existing residential dwelling situated on the Premises together with no more than five (5) acres immediately surrounding the proposed residential development (which five (5) acres will include the existing tennis court, volleyball court, and swimming pool), the precise size, location, dimensions and configuration of which shall be mutually determined by Seller and Buyer. It is further understood and agreed that within the said excluded five (5) acres, Seller may make available to United Water Corporation a site for a water storage tank provided; however,

that all negotiations respecting the location, design, construction and landscaping of the said water storage tank shall be conducted by both parties and any agreement thereon must be approved by both parties.

Lexington Heights was purchasing the property for development, and the purchase price was to be $20,000 per acre if the City of Eagle approved development with a gross density of fewer than two residential dwelling units per acre and $22,500 per acre if the City approved a higher gross density. Lexington Heights paid $300,000 in earnest money, and the Crandlemires executed a deed of trust on the entire property to secure repayment of the earnest money in the event that certain contingencies did not occur. One of those contingencies was that within two years Lexington Heights would receive approval from all necessary governmental agencies permitting development of the property at a density of not less than one residential dwelling per two acres. Under the zoning in existence at the time, residential lots had to be five acres or larger in size.

The property was surveyed on May 4 and 5, 1999, and three legal descriptions were prepared: one for the entire property, one for 4.54 acres to be retained by the Crandlemires, and one for 0.46 acres to be conveyed to United Water Corporation. Mr. Crandlemire personally participated in identifying for the surveyor the five acres he wanted excluded from the sale.

In early 2000, the Crandlemires desired to explore the possibility of selling the five acres they would retain to a third party, who would develop it as a retirement community in connection with Lexington Heights's proposed development. Because exploration of that concept would require that the development be delayed, the parties on October 30, 2000, executed a second real estate contract (the Agreement). The Agreement provided that it "supersedes all prior agreements between the parties hereto, whether in writing or otherwise; and any such prior agreement shall have no force or effect upon the date of execution of this Agreement." The Agreement set the closing on December 31, 2001. Even though legal descriptions had been pre-

pared for the entire property, the property to be retained by the Crandlemires, and the property to be conveyed to United Water Corporation, the Agreement did not use or refer to those legal descriptions to describe the property to be sold. It simply repeated the property description contained in the first contract, including the provision setting forth how the "the precise size, location, dimensions and configuration" of the five-acre parcel excluded from the sale would be determined.

In May 2001, the third party eventually decided not to pursue development of the retirement community, and the respondent Blake Mayes (Mayes) investigated purchasing the five acres from the Crandlemires and an additional two acres from Lexington Heights, once it acquired the ninety acres. In August 2001, Mayes informed Lexington Heights that he would like to purchase ten to seventeen additional acres, but Lexington Heights rejected that proposal. In September 2001, Lexington Heights informed Mr. Crandlemire that its project had been delayed long enough and that it wanted to proceed with the closing. Mr. Crandlemire responded by proposing that the price for the property be increased by $200,000, which Lexington Heights refused to do. The Crandlemires refused to close the sale to Lexington Heights. On January 17, 2002, they sold forty acres of the property to Mayes.

On February 21, 2002, Lexington Heights filed this lawsuit against the Crandlemires and Mayes alleging six causes of action. It sought specific performance of the Agreement; damages for breach of the Agreement; damages for fraud and deception based upon the sale of the forty acres to Mayes; damages for negligence based upon Mayes' conduct in removing signs giving notice of a public hearing to be held on February 19, 2002, in connection with Lexington Heights's proposed development of the property; damages for intentional interference with prospective economic advantage based upon the sale of the forty acres to Mayes; and an order expunging from the public records the deed to Mayes and holding that Mayes and

the Crandlemires are estopped from asserting any claim to the ninety acres.

The Crandlemires answered and filed a counterclaim seeking damages for breach of the Agreement and slander of title, forfeiture of the earnest money, and an order expunging from the public records the deed of trust and the recorded Agreement. Mayes also answered and filed a counterclaim seeking damages for slander of title and an order expunging the deed of trust and the recorded Agreement.

On January 6, 2003, Mayes filed a motion to dismiss all of the claims in the complaint on the ground that the Agreement was unenforceable. On January 13, 2003, the Crandlemires moved to dismiss the complaint on the grounds that the Agreement was not enforceable because it lacked mutuality of remedy and/or obligations and because material terms were uncertain, incomplete, and ambiguous. The district court treated these motions as motions for summary judgment. On January 27, 2003, it issued a memorandum decision granting the motions on the grounds that the Agreement was unenforceable because it did not contain a sufficient legal description of the property being sold and because it lacked mutuality of obligation due to the contingencies in the Agreement. The district court granted the motions by memorandum decision entered on January 27, 2003. On February 10, 2003, the district court entered judgment dismissing the complaint. The judgment included a certificate pursuant to Rule 54(b) of the Idaho Rules of Civil Procedure. Lexington Heights timely filed a motion for reconsideration, which the district court denied by memorandum decision entered on March 16, 2003. Lexington Heights then timely appealed.

## II. ISSUES ON APPEAL

A. Did the district court err in holding that the real estate contract in this case was invalid because of an insufficient legal description?

B. Did the district court err in refusing to order arbitration?

C Did the district court err in· dismissing all of the claims of Lexington Heights?

D. Are the Crandlemires and Mayes entitled to an award of attorney fees on appeal?

## III. ANALYSIS

**A. Did the District Court Err in Holding that the Real Estate Contract in This Case Was Invalid Because of an Insufficient Legal Description?**

Idaho Code § 9–505 provides:

In the following cases the agreement is invalid, unless the same or some note or memorandum thereof, be in writing and subscribed by the party charged, or by his agent. Evidence, therefore, of the agreement cannot be received without the writing or secondary evidence of its contents:

. . . .

4. An agreement for the leasing, for a longer period than one (1) year, or for the sale, of real property, or of an interest therein. . . .

This portion of the statute has remained unchanged since the Territorial Legislature adopted it in 1881. Almost one hundred years ago, this Court addressed the requirement that a contract for the sale of real property must contain an adequate description of the property to be sold.

In *Allen v. Kitchen,* 16 Idaho 133, 100 P. 1052 (1909), this Court held invalid a real estate contract that described the property being sold as "Lots 11, 12, and 13, in block 13, Lemp's addition" and "Lot 27, Syringa Park addition, consisting of 5 acres." As this Court noted, "The contract nowhere shows or discloses the city, town, county, or state in which it was executed; nor does it show the city, county, state, or other civil or political division or district in which any of the property is situated." 16 Idaho at 137, 100 P. at 1053. When addressing the applicable law, this Court in *Kitchen* stated, "[T]he great majority of courts have held that executory contracts and agreements for the sale of real estate must be complete and speak in definite terms of all the conditions, terms, and descriptions necessary to constitute the contract." 16 Idaho at 141, 100 P. at 1055. With respect to the sufficiency of the description of the real property to be sold contained

in the written memorandum, this Court quoted with approval from *Craig v. Zelian*, 137 Cal. 105, 69 P. 853 (Cal.1902), as follows:

"An agreement for the sale of real property must not only be in writing and subscribed by the party to be charged, but the writing must also contain such a description of the property agreed to be sold, either in terms or by reference, that it can be ascertained without resort to parol evidence. Parol evidence may be resorted to for the purpose of identifying the description contained in the writing with its location upon the ground, but not for the purpose of ascertaining and locating the land about which the parties negotiated, and supplying a description thereof which they have omitted from the writing."

The Court then added, "This court has uniformly held that such a contract must speak for itself, and that parol evidence will not be admitted to supply any of its terms." 16 Idaho at 142, 100 P. at 1054. This Court has continued to adhere to these legal principles. *Garner v. Bartschi*, 139 Idaho 430, 435, 80 P.3d 1031, 1036 (2003), and *White v. Rehn*, 103 Idaho 1, 3, 644 P.2d 323, 325 (1982) (both quoting that portion of *Craig v. Zelian* quoted in *Allen v. Kitchen*). Likewise, in *City of Kellogg v. Mission Mountain Interests Ltd., Co.*, 135 Idaho 239, 244, 16 P.3d 915, 920 (2000) (citations omitted), this Court stated: "As a general rule, a written instrument purporting to convey real property must contain a sufficient description of the property. A description contained in a deed will be sufficient so long as quantity, identity or boundaries of property can be determined from the face of the instrument, or by reference to extrinsic evidence to which it refers."

In *Allen v. Kitchen*, the appellant argued that parol evidence should be admissible for the purpose of completing the description of the real property. In rejecting that argument, the Court stated:

In the case at bar, there is no reference to any record or external or extrinsic description from which a complete description could be had, and no natural object or permanent monument is referred to in the writing, nor is any well and generally known point, place, or locality described or used as a tie. The evidence to be introduced would not be that of identification of a description, good on its face; but it would be for the purpose of supplying, completing, and perfecting a description on its face insufficient and incapable of application.

16 Idaho at 143–44, 100 P. at 1054. The Court added, "The distinction, however, should always be clearly drawn between the admission of oral and extrinsic evidence for the purpose of identifying the land described and applying the description to the property and that of supplying and adding to a description insufficient and void on its face." 16 Idaho at 144, 100 P. at 1055. With respect to the requirements of the statute of frauds, the Court in *Kitchen* stated, "It requires the contract to be in writing, and prohibits oral evidence to establish a contract of this kind. There is no contract until it is reduced to writing as provided by law. It is not a question as to what the contract was intended to be, but, rather, was it consummated by being reduced to writing as prescribed by the statute of frauds." 16 Idaho at 145, 100 P. at 1055.

■ In the instant case, the Agreement provided:

A precise legal description of the Premises will be prepared as a result of an ALTA survey to be obtained by Seller. It is understood and agreed that Seller may sell to a third party the existing residential dwelling situated on the Premises together with no more than five (5) acres immediately surrounding the proposed residential development (which five (5) acres will include the existing tennis court, volleyball court, and swimming pool), the precise size, location, dimensions and configuration of which shall be mutually determined by Seller and Buyer.

The parcel of property owned by the Crandlemires consisted of about ninety-five acres. They agreed to sell ninety of those acres to Lexington Heights. There was no legal description of the approximate five-acre parcel that was to be excluded from the sale, nor is there any reference to the boundaries of such five-acre parcel. "A description contained in a deed will be sufficient so long as quantity,

identity or boundaries of property can be determined from the face of the instrument, or by reference to extrinsic evidence to which it refers." *City of Kellogg v. Mission Mountain Interests Ltd., Co.,* 135 Idaho 239, 244, 16 P.3d 915, 920 (2000) (citation omitted). The legal description in the Agreement does not contain a sufficient description of the property to be sold because it does not contain any description sufficient to identify the approximate five-acre parcel that is to be excluded from the sale.

Lexington Heights argues that we should construe the Agreement as containing two contracts: one by which it purchased the entire ninety-five acres from the Crandlemires and the second by which it agreed to sell approximately five acres back to the Crandlemires. If the legal description of the parcel to be sold back to the Crandlemires was not sufficient for that part of the Agreement to be enforced, then Lexington Heights is entitled to acquire the entire ninety-five acres, including the residence, swimming pool, tennis court, and volleyball court, for the price of the ninety acres of undeveloped land. We cannot give the Agreement a tortured construction in order to uphold it. It is clear from the face of the Agreement that an approximate five-acre parcel, including the residence, swimming pool, tennis court, and volleyball court, was not to be included in the sale.

Lexington Heights next argues that "the precise size, location, dimensions and configuration" of the approximate five-acre parcel were not material to the Agreement. The parcel excluded from the sale could be generally located because it was not to exceed five acres and must include the residence, swimming pool, tennis court, and volleyball court. According to Lexington Heights, it was not material how the Crandlemires drew the boundaries of such five-acre parcel. The Agreement itself, however, shows that the precise boundaries of the five-acre parcel were material. The Agreement states that "the precise size, location, dimensions and configuration of which shall be mutually determined by Seller and Buyer." That provision shows that the parties had not yet agreed upon the boundaries of the five-acre parcel to be excluded and that those bound-aries were material because both parties had to agree upon them. The Crandlemires were not given the authority under the Agreement to choose whatever configuration they desired for the approximate five acres to be excluded from the sale.

Lexington Heights contends that there is no dispute between the parties as to the five-acre parcel to be excluded from the sale. After the first contract was executed, the Crandlemires had a survey completed of the five-acre parcel they wanted to retain. The surveyor submitted an affidavit that included as exhibits both a copy of that survey and an aerial photograph over which the surveyor had digitally overlaid the survey boundaries. That exhibit showed that the survey boundaries followed an existing fence enclosing the residence, swimming pool, tennis court, and volleyball court with the exception of the western boundary where the survey line was west of the fence in order to make the excluded area five acres in size. Lexington Heights argues that with this survey, there is no disagreement as to the property to be excluded from the sale. Neither that survey nor the legal description obtained as a result of that survey were included in, attached to, or referenced by the Agreement, however. Had the parties agreed that the boundaries of the excluded parcel would be as shown by the survey, they could easily have included the legal description of that parcel in the Agreement. They did not do so, however. Not only does the record not show that Lexington Heights ever agreed that the "the precise size, location, dimensions and configuration" of the five-acre parcel would be as described in that survey, but, more importantly, any such agreement was not included in the written memorandum. With respect to the statute of frauds, the issue is not whether the parties had reached an agreement. The issue is whether that agreement is adequately reflected in their written memorandum. "[E]xecutory contracts and agreements for the sale of real estate must be complete and speak in definite terms of all the conditions, terms, and descriptions necessary to constitute the contract." *Allen v. Kitchen,* 16 Idaho 133, 141, 100 P. 1052, 1055 (1909).

Lexington Heights also argues that because the survey generally follows the existing fence, we should hold that the parties intended that the boundary of the approximate five-acre parcel would be the existing fence enclosing the residence, swimming pool, tennis court, and volleyball court. Since the area enclosed within that fence was about five acres, the parties must have intended that the fence would be the boundary of the parcel excluded from the sale. There are two problems with that argument. First, if the parties had agreed that the boundary of the parcel excluded from the sale would be the existing fence, they could have so stated in the Agreement. They did not do so, however. In fact, the Agreement showed that they had not so agreed. It stated that "the precise size, location, dimensions and configuration of which shall be mutually determined by Seller and Buyer." Second, the issue with respect to the statute of frauds is not whether the parties had agreed upon the precise dimensions of the property to be sold. It is whether the written memorandum contains an adequate description of the property to be sold. As this Court stated in *Allen v. Kitchen*, 16 Idaho 133, 145, 100 P. 1052, 1055 (1909), "There is no contract until it is reduced to writing as provided by law. It is not a question as to what the contract was intended to be, but, rather, was it consummated by being reduced to writing as prescribed by the statute of frauds." Even if the parties had agreed that the fence would be the boundaries of the property excluded from the sale, the Agreement is invalid under the statute of frauds because such alleged agreement was not included in the written Agreement.

Lexington Heights argues that we should uphold the Agreement by requiring the Crandlemires to provide the legal description of the property to be sold, as they were required to do under the provisions of the Agreement. Again, however, the issue is not whether the parties had agreed upon the property to be sold or could provide a sufficient description of that property. Rather, the issue is whether their written memorandum contained a sufficient description of the property. "A description contained in a deed will be sufficient so long as quantity, identity or boundaries of property can be determined from the face of the instrument, or by reference to extrinsic evidence to which it refers." *City of Kellogg v. Mission Mountain Interests Ltd., Co.*, 135 Idaho 239, 244, 16 P.3d 915, 920 (2000) (citation omitted). Because the Agreement did not include a sufficient description of the property to be sold, it is invalid regardless of whether the parties did or could have agreed upon the boundaries of that property and the Crandlemires could have then obtained a survey of the property.

■ Finally, Lexington Heights argues that the district court erroneously concluded that it was confined to the four corners of the Agreement and could not consider extrinsic evidence to identify the location of the five acres to be reserved from the sale. As we stated in *Allen v. Kitchen*, 16 Idaho 133, 143–44, 100 P. 1052, 1054 (1909):

> In the case at bar, there is no reference to any record or external or extrinsic description from which a complete description could be had, and no natural object or permanent monument is referred to in the writing, nor is any well and generally known point, place, or locality described or used as a tie. The evidence to be introduced would not be that of identification of a description, good on its face; but it would be for the purpose of supplying, completing, and perfecting a description on its face insufficient and incapable of application.

This Court added, "The distinction, however, should always be clearly drawn between the admission of oral and extrinsic evidence for the purpose of identifying the land described and applying the description to the property and that of supplying and adding to a description insufficient and void on its face." 16 Idaho at 144, 100 P. at 1055.

Although the Agreement provides that the parcel excluded from the sale would include the land upon which the residence, swimming pool, tennis court, and volleyball court were located, the excluded property was not limited to such land. The Agreement did not simply exclude from the sale the residence, swimming pool, tennis court, and volleyball court, and the land upon which such struc-

tures were located. Rather, it excluded "the existing residential dwelling situated on the Premises together with no more than five (5) acres immediately surrounding the proposed residential development (which five (5) acres will include the existing tennis court, volleyball court, and swimming pool)." It is clear from the face of the Agreement that the excluded property was more than the land upon which these structures were located. Thus, extrinsic evidence could certainly identify the structures described, but there was nothing in the Agreement from which you could identify the boundaries of the approximate five-acre parcel that would include, but not be limited to, the land upon which those structures were located. The Agreement did not reference as the boundaries of the excluded parcel any structure or landmark (e.g., the existing fence enclosing the residence, swimming pool, tennis court, and volleyball court) that could then be identified by parol evidence.

In arguing that parol evidence should have been admissible to identify the property to be excluded from the sale, Lexington Heights relies upon *Spongberg v. First National Bank of Montpelier,* 15 Idaho 671, 99 P. 712 (1909); *Robison v. Frasier,* 89 Idaho 326, 404 P.2d 877 (1965); *City of Kellogg v. Mission Mountain Interests Ltd., Co.,* 135 Idaho 239, 16 P.3d 915 (2000); and *Thorn Springs Ranch, Inc. v. Smith,* 137 Idaho 480, 50 P.3d 975 (2002). None of those cases are applicable to the issue here. In *Spongberg,* the First National Bank of Montpelier entered into a written agreement to lease "the side room of our bank." The contract showed on its face that it referred to the bank's building in Montpelier, Idaho. At trial, plaintiff's counsel asked the plaintiff what bank building or room he had in view, and the trial court sustained an objection to that question. It then granted judgment in favor of the bank, and the plaintiff appealed. This Court held, "The purpose of counsel in asking this question evidently was to fix the particular ground upon which such building was located, and we think it proper for the plaintiff to make such proof." 15 Idaho at 676, 99 P. at 713. This Court stated the applicable rule of law to be, "The question merely called upon the witness to fully and particularly identify

the property with reference to which the contract was made, and which was referred to and described generally in the contract. That oral testimony may be admitted for this purpose ... is the rule in this state." 15 Idaho at 676–77, 99 P. at 713. In *Spongberg,* the written agreement did not provide that the plaintiff would lease the side room in the bank and some undefined land surrounding the bank. The lease by its terms was limited to the side room in the bank.

In *Mission Mountain,* the written agreement was for the conveyance of a ski lodge known as Tamarack Lodge, the land upon which it was located, and Chair Lift No. 4. Attached to the agreement was a map of the area showing that portion of the forest in which the lodge and chair·lift were located and containing designations entitled "chair lift" and "lodge." There was only one "Tamarack Lodge" and one "Chair Lift No. 4" in the relevant area. In holding the description sufficient under the statute of frauds, this Court stated, "Thus, the quantity of land involved was only the amount directly underneath the lodge, and not some other, larger parcel within the ski resort area." 135 Idaho at 245, 16 P.3d at 921. In this case, the terms of the written Agreement showed that the quantity of land involved was not limited to the amount directly underneath the described structures—the residence, swimming pool, tennis court, and volleyball court.

The *Robison* case was an action by a realtor to recover a real estate commission. The listing agreement described the property as "situated at 1 1/2 [miles] up Cotton Wood Creek, South, Council, * * * 2000 acres more or less, in Adams County, Idaho, located in Twp. 16 North, Range 1 West B. M." The trial court held that description insufficient and dismissed the case, and the realtor appealed. This Court had previously held in *Murphy v. Livesay,* 34 Idaho 793, 197 P. 536 (1921), and *Laker Land & Loans v. Nye,* 40 Idaho 793, 237 P. 630 (1925), that to be enforceable, a listing agreement must have a description of the real property that would be sufficient under the statute of frauds for a contract to sell the real property. The realtor asked this Court to overrule those two prior cases. The Court neither held the descrip-

tions sufficient under the statute of frauds nor overruled the two prior cases. Rather, it simply distinguished them, stating:

> Here, the amount of land is set forth, the location is set forth, not only by the reference to its relationship to a creek, but also as to the county, state, township and range. The evidence offered is competent to apply the description in the agreement, to the land in question.
>
> In reaching the foregoing conclusion, it is not necessary to overrule the cases of Murphy v. Livesay and Laker Land & Loans for they are clearly distinguishable from the facts in the instant case.

In the next mention of those cases in an opinion of this Court, we overruled them. *Central Idaho Agency, Inc. v. Turner,* 92 Idaho 306, 442 P.2d 442 (1968); *C. Forsman Real Estate Co., Inc. v. Hatch,* 97 Idaho 511, 547 P.2d 1116 (1976). The instant case is not one to enforce a listing agreement. In addition, the listing agreement in *Robison* did not involve the sale of a portion of a parcel of property owned by the defendant.

In *Thorn Springs Ranch,* the trial court held that there was sufficient part performance to take the contract out of the operation of the statute of frauds. The issue on appeal was whether there was sufficient evidence to support the trial court's finding that the parties had reached an oral agreement for the transfer of a parcel of real property, not whether they had signed a written memorandum that complied with the statute of frauds. On appeal, we held that the evidence was sufficient to sustain the findings of the trial court. In this case, the doctrine of part performance has not been raised.

The district court did not err in holding that the Agreement was invalid because it did not contain a sufficient description of the property to be sold. We need not address, and express no opinion upon, the alternative ruling of the district court that the Agreement was void for lack of mutuality. Likewise, because it has not been raised on appeal we express no opinion regarding what effect, if any, the Crandlemires' counterclaim seeking damages for breach of the Agreement would have on their statute of frauds defense.

## B. Did the District Court Err in Refusing to Order Arbitration?

▪ The Agreement contained the following provision:

> 21. *DISPUTE RESOLUTION:* In the event of a dispute, disagreement, controversy, or claim arising out of, pursuant to, or in connection with this Agreement, the parties shall attempt to mediate a settlement in good faith prior to initiating arbitration or litigation. If the dispute is not resolved through formal mediation, the parties hereto may submit the matter to binding arbitration through the American Arbitration Association as follows:
>
> (a) Within ten (10) days of written notice of one party to the other of a demand for arbitration, each party shall designate, in writing, the name and address of an arbitrator to be a member of a three-person arbitration panel. Within fifteen (15) days of the date upon which two arbitrators have thus been selected such arbitrators shall, by mutual agreement, appoint a third arbitrator to complete such arbitration panel.
>
> . . . .

The district court denied Lexington Heights's motion to compel arbitration on the ground that the wording stating that "the parties hereto may submit the matter to binding arbitration" showed that the provision was permissive, not mandatory. We need not address that issue, however.

▪ An agreement that does not comply with the statute of frauds is invalid. IDAHO CODE § 9–505 (1998). The failure to comply with the statute of frauds renders the agreement unenforceable both in an action at law for damages and in a suit in equity for specific performance. *Garner v. Bartschi,* 139 Idaho 430, 435, 80 P.3d 1031, 1036 (2003); *Hemingway v. Gruener,* 106 Idaho 422, 679 P.2d 1140 (1984); *Hoffman v. S V Co., Inc.,* 102 Idaho 187, 628 P.2d 218 (1981). The Agreement being unenforceable for noncompliance with the statute of frauds, Lexington Heights cannot enforce that part of the Agreement regarding arbitration.

## C. Did the District Court Err in Dismissing All of the Claims of Lexington Heights?

In their first cause of action, Lexington Heights sought specific performance of the Agreement. Because the Agreement was invalid under the statute of frauds, the district court properly granted summary judgment dismissing that claim. In its complaint, Lexington Heights also alleged causes of action seeking damages for breach of the Agreement; damages for fraud and deception based upon the sale of the forty acres to Mayes; damages for negligence based upon Mayes' conduct in removing signs giving notice of a public hearing to be held on February 19, 2002, in connection with Lexington Heights's proposed development of the property; damages for intentional interference with prospective economic advantage based upon the sale of the forty acres to Mayes; and an order expunging from the public records the deed to Mayes and holding that Mayes and the Crandlemires are estopped from asserting any claim to the ninety acres. The district court dismissed these remaining claims because it concluded that they "all rely on the existence of a valid contract between the parties."

On appeal, Lexington Heights argues that the district court erred. It addresses only four of the counts: fraud and deception, negligence, tortious interference with prospective economic advantage, and equitable estoppel. It merely lists the elements of those causes of action and then argues that because they were tort claims, they do not require the existence of a contract.

▮▮▮ Issues considered on summary judgment are those raised by the pleadings. *O'Guin v. Bingham County,* 139 Idaho 9, 72 P.3d 849 (2003). In its allegation of fraud and deception, Lexington Heights alleged that the Crandlemires and Mayes conspired to terminate the Agreement and then conveyed the forty acres to Mayes "in an attempt to defraud the Plaintiff and to inflict damage, loss, cost, expense and attorney fees." Lexington Heights does not attempt to explain how either the termination of the Agreement or the sale of the forty acres to Mayes could constitute an attempt to defraud

it, nor does it point to any evidence in the record supporting that claim. In its allegation of negligence, Lexington Heights alleged that the Crandlemires and Mayes took actions that delayed the planning and zoning hearing regarding the subject property and refused to close the transaction under which Lexington Heights was to purchase the property. Lexington Heights did not own and did not have a valid contract to purchase the property. It does not attempt to explain how delaying the planning and zoning meeting or refusing to close the transaction constituted a claim for negligence, nor does it point to any evidence in the record supporting that claim. In its allegation of tortious interference with prospective economic advantage, Lexington Heights alleges that the sale of the forty acres to Mayes caused it significant economic damage. That tort requires a showing that the interference was . wrongful beyond the fact of the interference itself. *Idaho First Nat'l Bank v. Bliss Valley Foods, Inc.,* 121 Idaho 266, 824 P.2d 841 (1991). Lexington Heights does not attempt to explain how the sale to Mayes of the forty acres was wrongful in the manner required for that tort, nor does it point to any evidence in the record supporting that allegation. Finally, in its claim for estoppel Lexington Heights alleged that the Crandlemires and Mayes have "been guilty of dealing with the Plaintiff with unclean hands" and that each of them "should be estopped from asserting any claim to the real property and the Warranty Deed which was placed as record should be expunged." Assuming that a real estate contract that was invalid because of noncompliance with the statute of frauds could be enforced under the doctrine of equitable estoppel, Lexington Heights has not explained how equitable estoppel even applies to the facts of this case, nor does it point to any evidence in the record supporting that allegation. The district court did not err in dismissing the remaining counts in Lexington Heights's complaint.

## D. Are the Crandlemires and Mayes entitled to an award of attorney fees on appeal?

▮▮▮ Both the Crandlemires and Mayes seek an award of attorney fees under Idaho

Code § 12–120(3) on the ground that Lexington Heights's complaint was an action to recover in an alleged commercial transaction. They both requested attorney fees below, and the district court denied their request because they each had pending counterclaims that had not been resolved by the grant of partial summary judgment.

With respect to Mayes, the complaint does not allege any commercial transaction between Lexington Heights and Mayes. It simply alleges that by his conduct Mayes interfered with a commercial transaction between Lexington Heights and the Crandlemires. Therefore, Mayes is not entitled to an award of attorney fees under Idaho Code § 12–120(3).

With respect to the Crandlemires, the complaint does allege a commercial transaction. "The term 'commercial transaction' is defined to mean all transactions except transactions for personal or household purposes." IDAHO CODE § 12–120(3) (1998). The purpose of the alleged Agreement was for Lexington Heights to acquire the ninety acres to develop it into a subdivision. Therefore, the alleged Agreement was a commercial transaction. *Garner v. Bartschi*, 139 Idaho 430, 435, 80 P.3d 1031, 1036 (2003); *Taylor v. Just*, 138 Idaho 137, 59 P.3d 308 (2002); *Farm Credit Bank of Spokane v. Stevenson*, 125 Idaho 270, 869 P.2d 1365 (1994). Where a party alleges the existence of a contract that would be a commercial transaction under Idaho Code § 12–120(3), that claim triggers the application of the statute and the prevailing party may recover attorney fees even if no liability under the contract is established. *Miller v. St. Alphonsus Reg'l Med. Ctr., Inc.*, 139 Idaho 825, 87 P.3d 934 (2004); *Magic Lantern Prods., Inc.*, 126 Idaho 805, 892 P.2d 480 (1995). Because the Crandlemires' counterclaim still remains to be resolved, the district court has not yet determined whether they are prevailing parties in this lawsuit. Therefore, if the district court determines that the Crandlemires are prevailing parties once their counterclaim is resolved, it may award them attorney fees for this appeal. *Magic Lantern Prods., Inc.*, 126 Idaho 805, 892 P.2d 480 (1995).

## IV. CONCLUSION

We affirm the partial summary judgment. Costs on appeal are awarded to the respondents.

Justices SCHROEDER, KIDWELL and BURDICK concur.

Chief Justice TROUT sat but did not participate.