# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 34885-2007

SAINT ALPHONSUS DIVERSIFIED CARE, INC., an Idaho nonprofit corporation,

Plaintiff-Appellant,

v.

MRI ASSOCIATES, LLP, an Idaho limited liability partnership,

Defendant-Respondent.

_____

MRI ASSOCIATES, LLP, an Idaho limited liability partnership, on its own behalf, and on behalf of MRI Limited, an Idaho limited partnership, and MRI Mobile Limited, an Idaho limited partnership,

Counterclaimant-Respondent,

v.

SAINT ALPHONSUS DIVERSIFIED CARE, INC., an Idaho nonprofit corporation; and SAINT ALPHONSUS REGIONAL MEDICAL CENTER, INC.,

Counterdefendants-Appellants.

Boise, August 2009 Term

2009 Opinion No. 132

Filed: October 21, 2009

Stephen W. Kenyon, Clerk

---

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, in and for Ada County. The Hon. Michael R. McLaughlin, District Judge.

The judgment of the district court is <u>vacated</u> and this case is <u>remanded</u>.

Jones Day, Washington, D.C.; Gjording & Fouser, PLLC, Boise; and Givens Pursley LLP, Boise, for appellants. Donald B. Ayer argued.

Banducci Woodard Schwartzman PLLC, Boise, for respondent. Thomas A. Banducci argued.

---

EISMANN, Chief Justice.

This is an appeal from a judgment against a general partner for wrongful dissociation, breach of a noncompete clause, breach of the covenant of good faith and fair dealing, intentional interference with prospective contractual relations or business expectations, breach of fiduciary duties, and civil conspiracy. We vacate the judgment and remand this case for further proceedings.

## I. BACKGROUND

Doctors of Magnetic Resonance, Inc.; Saint Alphonsus Diversified Care, Inc.;[1] Mednow, Inc.; and HCA of Idaho, Inc.,[2] formed a general partnership named MRI Associates (MRIA).[3] The parties executed a written partnership agreement that was effective on April 26, 1985. The purpose of the partnership was to acquire and operate diagnostic and therapeutic devices, equipment, and accessories, beginning with a magnetic resonance imaging (MRI) scanner; to acquire related buildings and other facilities; and to transact all business matters incident to such activities. MRIA and others formed two limited partnerships: MRI Limited Partnership (MRI Center), which owned and operated an MRI scanner located on the hospital campus of St. Alphonsus Regional Medical Center (St. Alphonsus) under the name of MRI Center of Idaho, and MRI Mobile Limited Partnership (MRI Mobile), which owned and operated mobile MRI scanners. MRIA owned thirty percent of, and was the general partner of, each limited partnership.

For years following the creation of MRIA, physicians at St. Alphonsus used MRI Center to produce MRI scans and radiologists from the Saint Alphonsus Radiology Group, also known as Gem State Radiology (GSR), to read the scans. The radiologists organized as GSR were under an exclusive contract to serve the professional radiological needs of St. Alphonsus's patients.

In 1998, the radiologists at GSR began planning to construct and operate an outpatient medical imaging facility that would provide a full range of medical imaging services, including

---

[1] Saint Alphonsus Diversified Care, Inc., is the successor of Saint Alphonsus Magnetic Resonance, Inc., which was an original partner in MRIA.

[2] West Valley Medical Center, Inc., later succeeded to the interest of HCA of Idaho, Inc.

[3] On January 1, 1995, The Dominican Sisters of Ontario, Inc., an Oregon corporation doing business as Holy Rosary Medical Center, joined the partnership.

both MRI imaging and other imaging services that were not provided by MRI Center. After GSR had acquired land in downtown Boise, it disclosed its plans to St. Alphonsus and encouraged it to become involved in the project. Thereafter, there were unsuccessful negotiations among the GSR radiologists, St. Alphonsus, and MRIA to have one medical imaging entity.

The radiologists formed the partnership Intermountain Medical Imaging, LLC (Intermountain Imaging), which began operating on September 1, 1999. On July 1, 2001, Saint Alphonsus became a partner in the non-MRI part of the business of IMI.

On February 24, 2004, Saint Alphonsus Diversified Care, Inc. gave notice to MRIA that it would dissociate from the partnership effective on April 1, 2004, and on October 18, 2004, it filed this lawsuit seeking a judicial determination of the amount it was entitled to receive for its interest in MRIA. MRIA responded by filing a multi-count counterclaim against Saint Alphonsus Diversified Care, Inc., and against St. Alphonsus[4] (both herein called St. Alphonsus) and by filing third-party claims. The claims against the third-party defendants were ultimately dismissed.

Ultimately, the case went to a jury trial on the remaining causes of action in MRIA's counterclaim alleging causes of action for wrongful dissociation, breach of a noncompete clause, breach of the covenant of good faith and fair dealing, intentional interference with prospective contractual relations or business expectations, breach of fiduciary duties, and civil conspiracy. The jury found St. Alphonsus liable on all causes of action, and awarded damages of $63.5 million. The district court reduced the verdict to $36.3 million after determining that the jury had totaled damage awards on two alternative theories. The court also denied St. Alphonsus's motions for a judgment notwithstanding the verdict or a new trial. St. Alphonsus then timely appealed.

## II. ISSUES

1. Did the district court err in holding that St. Alphonsus wrongfully dissociated from MRIA?
2. Did the district court err in submitting to the jury the issue of whether the partnership agreement contained a definite term?

---

[4] Saint Alphonsus Diversified Care, Inc., is a wholly-owned subsidiary of St. Alphonsus.

3.  Did the district court err in admitting into evidence a memorandum that included a reference to legal advice received by St. Alphonsus?

4.  Did the district court err by admitting into evidence a settlement offer made by MRIA?

5.  Must the award of damages be vacated because it includes damages sustained by nonparties?

6.  Must the award of damages be vacated because it includes lost profits beyond the term of the partnership?

7.  Must the award of damages be vacated because there was insufficient evidence to support the award of lost profits?

8.  Does the evidence support an award of damages based upon the value of MRIA?

9.  Did the district court err in denying MRIA's motion to amend to add a claim for punitive damages?

10.  Did the district court err in dismissing MRIA's antitrust cause of action?

11.  Is either party entitled to an award of attorney fees on appeal?

## III.  ANALYSIS

### A.  Did the District Court Err in Holding that St. Alphonsus Wrongfully Dissociated from MRIA?

St. Alphonsus dissociated from MRIA on April 1, 2004.  MRIA included in its counterclaim a cause of action for wrongful dissociation alleged under two theories:  (a) the dissociation breached an express provision of the partnership agreement and (b) the partnership agreement had a definite term and the dissociation occurred prior to the expiration of that term. MRIA and St. Alphonsus both filed motions for partial summary judgment on that cause of action.  The district court granted MRIA's motion for summary judgment, holding that St. Alphonsus's dissociation was wrongful because it breached an express provision of the partnership agreement.  The court did not discuss the alternative theory that the dissociation occurred prior to the expiration of the definite term of the partnership.  St. Alphonsus contends the district court erred in granting the partial summary judgment.

"A partner who wrongfully dissociates is liable to the partnership and to the other partners for damages caused by the dissociation."  I.C. § 53-3-602(c).  A partner's dissociation is wrongful if "[i]t is in breach of an express provision of the partnership agreement."  I.C. § 53-3-602(b)(1).  Whether there is an express provision in the partnership agreement that was breached

4

by the dissociation is an issue of law over which we will exercise free review. *See Howard v. Perry*, 141 Idaho 139, 142, 106 P.3d 465, 468 (2005) ("Whether a contract is ambiguous is a question of law over which we exercise free review."). The partnership agreement was effective on April 26, 1985. Because of a subsequent change in the applicable law, it is necessary to first discuss how the agreement is to be viewed when addressing this issue.

When the parties entered into the partnership agreement, the applicable law in Idaho was the "Uniform Partnership Law" (UPL), former I.C. §§ 53-301 *et seq.*[5] The UPL did not include the concept of dissociation. Under the UPL, a partnership was not a legal entity distinct from the partners. *Swope v. Swope*, 112 Idaho 974, 981, 739 P.2d 273, 280 (1987). It was "an association of two or more persons to carry on as co-owners a business for profit." *State v. Cosgrove*, 36 Idaho 278, 285, 210 P. 393, 395 (1922); former I.C. § 53-306(1). Therefore, the withdrawal of one partner caused a dissolution of the partnership. *Kelly v. Silverwood Estates*, 127 Idaho 624, 628, 903 P.2d 1321, 1325 (1995); *Elliot v. Elliot*, 88 Idaho 81, 86, 396 P.2d 719, 722 (1964); former I.C. § 53-329. A partner could at any time withdraw from the partnership by the partner's express will to cease being associated in the carrying on of the partnership business. Former I.C. §§ 53-329 & 53-331.[6] If that breached the partnership agreement, the partner could be liable for wrongful dissolution. Former I.C. § 53-338(2)(a)(2).

In 1998, the UPL was repealed effective July 1, 2001, and the "Uniform Partnership Act (1996)" (RUPA), I.C. §§ 53-3-101 *et seq.*, was enacted effective January 1, 2001.[7] Ch. 65, §§ 1

---

[5] The partnership agreement recites, "Except as modified hereunder, the parties hereto hereby form a general partnership pursuant to the Uniform Partnership Law of the State of Idaho."

[6] Those statutes provided:

> **53-329. Dissolution defined**. The dissolution of a partnership is the change in the relation of the partners caused by any partner ceasing to be associated in the carrying on as distinguished from the winding up of the business.

> **53-331. Causes of dissolution.** Dissolution is caused:
> 1. Without violation of the agreement between the partners.
> . . .
>     b. By express will of any partner when no definite term or particular undertaking is specified.
> . . .
>     2. In contravention of the agreement between the partners, where the circumstances do not permit a dissolution under any other provision of this section, by the express will of any partner at any time.

[7] The new Act is also known as the Revised Uniform Partnership Act (RUPA). *Costa v. Borges*, 145 Idaho 353, 356, 179 P.3d 316, 319 (2008).

& 3, 1998 Idaho Sess. Laws 226, 227, 259. The RUPA introduced the new concept of "dissociation."

Under the RUPA, "[a] partnership is an entity distinct from its partners." I.C. § 53-3-201(a). An association of two or more persons to carry on as co-owners a business for profit *forms* a partnership; they are not the partnership. I.C. § 53-3-202(a). A partner who chooses to withdraw from the partnership is dissociated, I.C. § 53-3-601(1), but "[t]he dissociation of the partner does not require the dissolution of the partnership and the winding up of its affairs." *Costa v. Borges*, 145 Idaho 353, 357, 179 P.3d 316, 320 (2008). A partner has the power to dissociate at any time, rightfully or wrongfully. I.C. § 53-3-602(a). If a partner wrongfully dissociates, a majority in interest of the remaining partners can, within ninety days, agree to continue the partnership, I.C. § 53-3-801(1) & (2)(i), but they will have to purchase the dissociating partner's interest. I.C. § 53-3-701.

Under the UPL, a partner by express will could cease to be associated in the carrying on of the partnership business. Former I.C. §§ 53-329 & 53-331(1)(b) & (2). Under the RUPA, a partner can give notice of the partner's express will to withdraw as a partner, which terminates the partner's right to participate in the management and conduct of the partnership business. I.C. §§ 53-3-601(1) and 53-3-603(a). Under both statutory schemes, a partner can choose to withdraw from a partnership. Thus, the issue is whether St. Alphonsus's withdrawal from the partnership breached an express provision of the partnership agreement. In construing the meaning of the provision allegedly breached, however, the terms of the agreement must be viewed in the context of the UPL because that was the law in effect when the parties entered into the agreement.

The relevant provision of the partnership agreement is as follows:

ARTICLE 6
WITHDRAWAL OF HOSPITAL PARTNER
6.1 Conditions for withdrawal. Any Hospital Partner may withdraw from the Partnership at any time if, in a Hospital Partner's reasonable judgment, continued participation in this Partnership: (i) jeopardizes the tax-exempt status of such Hospital Partner or its parent or their subsidiaries; or (ii) jeopardizes medicare/medicaid or insurance reimbursements or participations; (iii) if the business activities of the Partnership are contrary to the ethical principles of the Roman Catholic Church as designated from time to time; or (iv) is or may be in

violation of any local, state or federal laws, rules or regulations. In the event that a Hospital Partner withdraws, such Hospital Partner's interest in the Partnership shall terminate on the date of withdrawal, and that interest, including, without limitation, the Hospital Partner's vote on the Board of Partners and its interest in the Partnership management fee, shall be reallocated among the remaining Hospital Partners. (If there are no remaining Hospital Partners, the reallocation shall be among the remaining Partners). Unless otherwise agreed, the withdrawing Hospital Partner shall only be entitled to receive for its interest in the Partnership an amount: which is equal to the balance in such Hospital Partner's capital account at the time of withdrawal.

      6.2   <u>Payment for Interest</u>. The price for the withdrawing Hospital Partner's interest in the partnership shall be paid to such Hospital Partner by the Partners to which its interest in the Partnership has been allocated, without interest, in installments equal to, and due at the same time as, distributions of the Net Cash Flow which the Hospital Partner would have received had it remained a Partner in the Partnership.

      6.3   <u>Loans and Other Liabilities</u>. Loans payable to the withdrawing Hospital Partner shall be paid as provided herein. Withdrawal shall not relieve the Hospital Partner from its contingent liability for its Capital Ratio share of Partnership liabilities in existence on the date of withdrawal.

When deciding whether St. Alphonsus's dissociation was wrongful, the district court considered only the first sentence in section 6.1 of the agreement. It concluded that the words "Any Hospital Partner may withdraw from the Partnership at any time if" followed by four defined circumstances was an express provision limiting the circumstances under which St. Alphonsus could rightfully dissociate. The court reasoned as follows:

> When reading contract terms, the Court must apply the ordinary and plain meaning to the words used. The word "if" is commonly defined as "a: in the event that, b: allowing that, c: on the assumption that, d: on condition that." Substituting one of these definitions into the contract language, section 6.1 allows the Hospital Partners to withdraw *on the condition that* one of the listed events occurs. In the reverse, if one of the four reasons is not present, the Hospital Partners *may not* withdraw from the partnership rightfully. In the Court's view, the use of "only" before "if" would be redundant in this context. The section, "Conditions for Withdrawal" lends further support to the Court's finding that "if" was expressly conditional language. (Emphases in original; citation and footnote omitted.)

The district court picked one definition of the word "if" ("on condition that") and concluded that section 6.1 established the conditions that must exist before a hospital partner could withdraw from the partnership without breaching the agreement. Another definition

rejected by the court would also be consistent with the context. The sentence could be read to state that the hospital partner may withdraw *in the event that* one of the listed events occurs. For example, the second sentence of the section begins, "In the event that a Hospital Partner withdraws . . . ." It would not change the meaning to substitute "If" for "In the event that." The district court found some support for its interpretation by the section title, "Conditions for Withdrawal." However, the word "conditions" is synonymous with "circumstances." *Roget's II*: *The New Thesaurus* 164 (Houghton Mifflin Co. 1988). With "if" and "conditions" given these alternative meanings, the section is not an *express* provision limiting the circumstances under which St. Alphonsus could withdraw without breaching the partnership agreement.

With these meanings, the section would provide that St. Alphonsus could withdraw from the partnership in the event that any of four circumstances occurred. To conclude it prohibited withdrawal unless one of those four circumstances occurred, one would have to apply the maxim *expressio unius est exclusio alterius* (the expression of one thing is the exclusion of another). "When certain persons or things are specified in a law, contract, or will, an intention to exclude all others from its operation may be inferred." *Black's Law Dictionary* 581 (6th ed. 1990). Application of the maxim is not mandatory. *Hewson v. Asker's Thrift Shop*, 120 Idaho 164, 166-67, 814 P.2d 424, 426-27 (1991). However, even if that maxim were applied to *infer* that these four circumstances were exclusive, that would not be an *express* provision limiting the circumstances in which St. Alphonsus could rightfully dissociate.

In *Asker's Thrift Shop*, a statute granted an injured employee "the right to have a physician or surgeon designated and paid by himself present at an examination by a physician or surgeon so designated by the employer." The employer's surety arranged for the employee to undergo a panel evaluation by a psychiatrist and neurologist, and the employee refused to undergo the examination unless either she could tape record it or her former husband could observe it. The Industrial Commission applied the maxim *expressio unius est exclusio alterius* and concluded that the statute only permitted the employee to have either a physician or surgeon present during the examination. It then dismissed the employee's case for refusing to submit to the examination, and she appealed. We held that the statute did not limit whom the employee could have present during the examination. We stated:

> Idaho Code § 72-433 does not contain any *express* enumeration of persons who can or can not attend a medical evaluation or exam. The statute simply guarantees the right of an employee to attend a compelled medical examination

with a physician of his or her choice. . . . The fact that the statute allows the employee's physician to be present, does not automatically or necessarily exclude all others.

120 Idaho at 167, 814 P.2 at 427 (emphasis added). If we inferred that the listing of four circumstances excluded all others, it would not be an *express* provision limiting the circumstances under which St. Alphonsus could withdraw from the partnership.

It is also necessary to consider the section in the context of the UPL to see if there was a reason for the provision other than limiting the circumstances under which a hospital could withdraw from the partnership without breaching the agreement. The four circumstances listed were ones beyond the control of the hospital partner in which it would, in essence, be compelled to withdraw from the partnership. They were:

[I]f . . . continued participation in [the] Partnership: (i) jeopardizes the tax-exempt status of such Hospital Partner or its parent or their subsidiaries; or (ii) jeopardizes medicare/medicaid or insurance reimbursements or participations; (iii) if the business activities of the Partnership are contrary to the ethical principles of the Roman Catholic Church as designated from time to time; or (iv) is or may be in violation of any local, state or federal laws, rules or regulations.

Under the UPL, if St. Alphonsus withdrew the partnership would be dissolved and its affairs wound up. Absent an agreement to the contrary, the partnership property would be applied to discharge its liabilities and the surplus, if any, paid to the partners. Former I.C. § 53-338(1).[8] If that occurred, St. Alphonsus and the other partners may have recovered less than they had invested in the partnership.

Article 6 could be read as a dissolution agreement applicable if a hospital partner was, in essence, forced to withdraw from the partnership for one of the four reasons listed. If that occurred, the partnership would be dissolved, but it would not have to be wound up. The remaining partners could continue the partnership business and pay off the withdrawing hospital partner over time. The hospital partner would receive an amount equal to the balance of its capital account, which may be more than it would receive if the partnership were wound up, and the remaining partners could have the benefit of continuing with the business.

---

[8] Former Idaho Code § 53-338(1) provided that when the dissolution did not breach the partnership agreement, "each partner, as against his copartners and all persons claiming through them in respect of their interests in the partnership, unless otherwise agreed, may have the partnership property applied to discharge its liabilities, and the surplus applied to pay in cash the net amount owing to the respective partners."

9

In addition, the district court held that article 6 was ambiguous insofar as whether the dissolution agreement in that provision applied to any withdrawal by a hospital partner or only to withdrawals for one of the four reasons listed. The court held that both interpretations were equally plausible. If the dissolution agreement only applied to those four reasons, it would add credence to the interpretation that article 6 was drafted only to permit a hospital partner to withdraw if it felt compelled to do so for one of those four listed reasons and, if it did so, to recover its investment. Thus, article 6 may have been drafted to cover the most likely situations in which a hospital partner may be forced to withdraw from the partnership due to circumstances beyond its control in order to allow the hospital partner to recover its investment and to permit the remaining partners to continue with the partnership business.

Idaho Code § 53-3-602(b)(1) provides that a dissociation is wrongful if it is "in breach of an express provision of the partnership agreement." The statute does not simply provide that dissociation is wrongful if it is in breach of the partnership agreement, or if it is in breach of a provision in the partnership agreement. It is only wrongful if it breaches an *express* provision of the partnership agreement. We have defined the word "express" as follows: "Black's Law Dictionary defines 'express' as, '[c]lear; definite; explicit; plain; direct; unmistakable; not dubious or ambiguous. Declared in terms; set forth in words. Directly and distinctly stated. Made known distinctly and explicitly, and not left to inference. 'Express' means 'manifested by direct and appropriate language.'" *Sweeney v. Otter*, 119 Idaho 135, 140, 804 P.2d 308, 313 (1990) (citations omitted). Because the provision limiting the right to withdraw rightfully must be an express provision, any doubt as to the meaning of the provision at issue must be resolved in favor of not limiting the right to withdraw. The provision of the partnership agreement at issue does not contain any prohibitive language. For example, it does not state that a hospital partner *shall not* withdraw from the partnership *except* under the specified circumstances. Likewise, it does not state that a hospital partner may *only* withdraw from the partnership under the specified circumstances.[9] We hold that the provision is not an express provision limiting the right to dissociate rightfully.

---

[9] *Webster's New Universal Unabridged Dictionary* 306 (Barnes and Noble Books 1989) gives an example of the word "condition" used when it means "a restricting, limiting, or modifying circumstance." The example is, "*It can happen only under certain conditions*. (Italics in original; emphasis added.)

St. Alphonsus was clearly prejudiced by the district court's determination that it had wrongfully dissociated from the partnership. At the beginning of the trial before opening statements, the district court instructed the jury, "The Court has already determined as a matter of law that Saint Alphonsus Diversified Care breached the MRI Associates Partnership Agreement when Saint Alphonsus Diversified Care, Inc., dissociated from MRI Associates in April of 2004." At the beginning of MRIA's opening statement, its counsel stated:

> What the real story in this case is about, though – it is about betrayal. It is about abandonment.
> Now, the court has said that it has found that Saint Alphonsus wrongfully withdrew from the partnership. That's been discussed in opening statement. It will be discussed – excuse me, it's been discussed during jury selection. It will be discussed in opening statement. You'll hear a lot about that.

At the conclusion of the evidence, the court again instructed the jury, "The following facts are not in dispute: St. Alphonsus and MRIA were partners and entered into a Partnership Agreement in 1985. St. Alphonsus disassociated from the partnership in April of 2004, and this dissociation has been determined by the Court to be a wrongful dissociation." When instructing the jury on the cause of action for wrongful dissociation, the court instructed the jury that the elements of the existence of the contract (partnership agreement) and St. Alphonsus's breach by wrongfully dissociating had already been established, and the jury need only decide the amount of damages proximately caused by that breach. In the damages instructions, the court again instructed the jury, "The Court has already determined that Saint Alphonsus's dissociation from the partnership was wrongful" and that if MRIA was damaged the jury should award an amount that will reasonably and fairly compensate MRIA "for any benefit of the bargain that the evidence proves they have lost and was proximately caused by Saint Alphonsus's wrongful dissociation from the partnership."

"An erroneous instruction is prejudicial when it could have affected or did affect the outcome of the trial." *Garcia v. Windley*, 144 Idaho 539, 543, 164 P.3d 819, 823 (2007). In this case, the court's erroneous instructions regarding wrongful dissociation were prejudicial in two respects. First, the court instructed the jury that St. Alphonsus had wrongfully dissociated, and the jury need only determine the amount of damages proximately caused by such wrongful dissociation. In the special verdict, the jury found that MRIA had been damaged by that wrongful dissociation. The jury awarded damages, which were not separated by cause of action.

11

Second, instructing the jury at the beginning of the trial that "the Court has already determined as a matter of law" that St. Alphonsus had breached the partnership agreement when it dissociated and instructing the jury at the conclusion of the evidence that the "facts are not in dispute" that St. Alphonsus's dissociation "has been determined by the Court to be a wrongful dissociation" could have affected the jury's determination on MRIA's other causes of action.

Two of the items of evidence introduced by MRIA were internal memoranda from the investment banking firm Shattuck Hammond. It had been retained to review various options under consideration by St. Alphonsus regarding its relationship with MRIA. One memorandum was dated August 22, 2001 (August Shattuck memorandum), and the other was dated September 25, 2001 (September Shattuck memorandum).

The August Shattuck memorandum included the following:

> SARMC [St. Alphonsus] has been exploring ways to exit MRIA but has met resistance from the other general partners, particularly the physicians, and from Jack Floyd, the recently appointed CEO of MRIA. (Reasons for this resistance are discussed later in the memorandum.) From the correspondence provided, SARMC is frustrated with the situation and is strongly considering simply withdrawing from MRIA and competing with existing MRI facilities on its own campus after the end of the one-year non-compete agreement. *SARMC has been advised by counsel that this option would likely engender litigation with MRIA.*
>
> . . . .
>
> Alternatives Considered by St. Alphonsus
>
> Presently SARMC is considering a number of alternatives for achieving their goal of ending the non-compete associated with their ownership in MRIA so that they can partner with SARG to provide MRI services on the St. Alphonsus campus and in the surrounding community. As mentioned previously, under the terms of the non-compete, SARMC must wait one year after exiting the general partnership before competing in magnetic resonance imaging within 100 miles of Boise. *In addition, there are "wrongful" termination provisions entitling the MRIA to damages in the event that SARMC exits the partnership for the purposes of competing with MRIA after the end of the non-compete.* We are awaiting the actual partnership agreement to analyze the wrongful termination provisions in more detail.
>
> . . . .
>
> Option A: Withdrawal from MRIA
>
> If SARMC's withdrawal from MRIA is not deemed wrongful, SARMC would be entitled to the liquidation value of their portion of the investment and, after a period of one year, would be able to compete in the Boise market. (It has been reported that DMR offered to accept $2.5 million to vote to waive the non-compete agreement and allow SARMC to open other centers.) *Givens Pursley* [St. Alphonsus's counsel] *believes that there would likely be litigation as to*

12

*whether the termination was wrongful and that there may be a risk of St. Alphonsus breaching its fiduciary responsibility to the LPs*. Under this scenario SHP would not receive a success fee. (Emphases added.)

The September Shattuck memorandum included the following:

> The following is an overview of the options under consideration by SARMC with regard to negating its non-compete. *These options have been reviewed with Givens Pursley, counsel to SARMC*, and *we have included their thoughts on the potential litigation involved with each alternative.*

> Option A: Withdrawal from MRIA
> If SARMC's withdrawal from MRIA is not deemed wrongful, SARMC would be entitled to the liquidation value of their portion of the investment and, after a period of one year, would be able to compete in the Boise market. . . . *Givens Pursley believes that there would likely be litigation as to whether the termination was wrongful and that there may be a risk of St. Alphonsus breaching its fiduciary responsibility to the LPs*. Under this scenario SHP would not receive a success fee.
> . . . .
> Current Status
> It is our understanding that St. Alphonsus would prefer Option D (Negotiated transaction with DMR). However, *management has become quite weary from years of debate on this matter and is leaning toward terminating its interests in MRIA*, receiving the liquidation value for its shares and competing in one year. *SARMC has informed other members of MRIA that they will not support future growth of MRIA as long as there are no plans to deal with SARMC's strategic goals of partnering with GSR.* (Emphases added.)

MRIA's counsel questioned St. Alphonsus's chief executive officer (CEO) extensively about St. Alphonsus's withdrawal from the partnership and about the memorandum stating that the withdrawal would likely engender litigation with MRIA. The CEO testified that she believed St. Alphonsus could rightfully dissociate under RUPA. She was asked, "[S]o, are you telling this jury that the – that you could withdraw without breaching the Partnership Agreement in 2004?" She answered, "I believe that Idaho law said that Saint Al's could withdraw from this agreement." Prior to asking the next question, MRIA's counsel stated, "We'll talk about Idaho law and your interpretation of Idaho law in a while." During the CEO's continued examination on the following day, she was asked, "It's fair to say that you didn't understand how the Idaho Code played into this issue of withdrawal?" She answered, "No. I understood that there was an Idaho statute that would allow us to withdraw." When asked what statute it was, she answered, "I think it's called RUPA."

The court's instructions that the dissociation was wrongful as a matter of law coupled with the Shattuck memoranda could have caused the jury to disbelieve other testimony by the CEO. The district court acknowledged that her belief as to the legality of the dissociation would be relevant to the claims for breach of fiduciary duty and breach of the covenant of good faith and fair dealing. When the court's erroneous instructions are considered with other evidence such as the above-quoted statements from the Shattuck memoranda, the erroneous instructions could have affected the jury's determination of other causes of action.

**B.   Did the District Court Err in Submitting to the Jury the Issue of Whether the Partnership Agreement Contained a Definite Term?**

As mentioned above, MRIA alleged its claim of wrongful dissociation under two theories. The second theory was that the partnership agreement was for a definite term and St. Alphonsus dissociated prior to the expiration of that term. Dissociation can also be wrongful if a partner withdraws by express will "[i]n the case of a partnership for a definite term . . . , before the expiration of the term." I.C. § 53-3-602(b)(2). The parties disagreed as to whether the partnership agreement had a definite term.

In ruling on the parties' motions for summary judgment on the wrongful dissociation claim, the district court did not address the alternative theory that the dissociation occurred before the expiration of the partnership's definite term. The court submitted that issue to the jury, and the jury found "that Saint Alphonsus has breached the Partnership Agreement by dissociating before the end of the partnership term." On appeal, St. Alphonsus does not challenge the jury's finding. Rather, it alleges that the district court committed error by submitting the issue to the jury.

MRIA contends that St. Alphonsus cannot raise this issue on appeal because the district court never ruled on it. In response, St. Alphonsus argues that it "moved for summary judgment on MRIA's claim of wrongful dissociation based on a definite term, and the trial court declined to so order, thus effectively denying the motion and leaving the claim in the case for trial." The district court did not address the issue on the cross motions for summary judgment. MRIA had one cause of action for wrongful dissociation alleged under two theories. Having granted summary judgment to MRIA on one theory, the court apparently did not see any need to address the alternate theory. Even though an issue was argued to the court, to preserve an issue for

14

appeal there must be a ruling by the court. *De Los Santos v. J.R. Simplot Co., Inc.*, 126 Idaho 963, 969, 895 P.2d 564, 570 (1995). St. Alphonsus never obtained a ruling by the district court on the alternative theory for wrongful dissociation. Likewise, St. Alphonsus did not object to the trial court's jury instructions submitting the issue to the jury. By failing to object, St. Alphonsus cannot raise the issue on appeal. *Jones v. Crawforth*, 147 Idaho 11, 19-20, 205 P.3d 660, 668-69 (2009) (where party failed to request during jury instruction conference that a nonparty be placed on the verdict form, the failure to include the nonparty on the verdict form could not be raised on appeal). "This Court does not review an alleged error on appeal unless the record discloses an adverse ruling forming the basis for the assignment of error." *Ada County Highway Dist. v. Total Success Invs., LLC*, 145 Idaho 360, 368-69, 179 P.3d 323, 331-32 (2008).

St. Alphonsus argues, "Saint Alphonsus also renewed this argument post-trial, explaining that '[a]s a matter of law, the MRIA partnership was not a partnership for a term, and it was an error in law to submit this issue to the jury.'" It is too late to raise an alleged error in the jury instructions in a post-trial motion for a judgment notwithstanding the verdict or, in the alternative, a new trial. *Bates v. Seldin*, 146 Idaho 772, 775-76, 203 P.3d 702, 705-06 (2009). St. Alphonsus has not alleged on appeal that the district court erred by denying the post-trial motions. Because St. Alphonsus did not obtain a ruling by the district court on the issue of whether the dissociation was wrongful because it occurred prior to the expiration of the definite term of the partnership and because it did not timely object to the submission of that issue to the jury, we will not consider the issue on appeal. However, because we remand this case for a new trial, the issue of whether the partnership was for a definite term and, if so, whether St. Alphonsus dissociated prior to the expiration of that term will have to be determined in further proceedings.

**C. Did the District Court Err in Admitting into Evidence a Memorandum that Included a Reference to Legal Advice Received by St. Alphonsus?**

St. Alphonsus contends that the district court erred in admitting into evidence the September Shattuck memorandum mentioned above. This memorandum is a later version of the August Shattuck memorandum, also discussed above. St. Alphonsus challenges only the admission of the September Shattuck memorandum. MRIA counters that St. Alphonsus failed to object to the admission of the memorandum at trial, and therefore cannot raise the issue on

appeal. In response, St. Alphonsus asserts that it was not required to object at trial because it "filed two motions *in limine* to exclude from evidence the portions of the Shattuck Hammond memo that summarized its lawyer's legal advice" and the district court "twice categorically denied" the motions. According to St. Alphonsus:

> On February 6, 2007, the court summarized Saint Alphonsus's privilege argument and held that it was "unable to find that Saint Alphonsus has proven the Shattuck Hammond Memo is privileged and therefore any references to the Shattuck Hammond Memo and the Memo itself will not be stricken." On the eve of trial, the court likewise rejected the second motion *in limine* to the extent it was addressed to the claim of attorney-client privilege, stating that it had "previously addressed the admissibility of this Shattuck Hammond Memorandum" and held that it "was admissible because Saint Alphonsus had failed to prove the Memo was subject to the attorney-client privilege." The district court thus had twice categorically denied Saint Alphonsus's motions to exclude portions of the memo based on attorney-client privilege.

St. Alphonsus's argument misstates the record.

In connection with its motion to seek punitive damages, MRIA's briefing and affidavits referred to the September Shattuck memorandum. St. Alphonsus moved to strike from the briefs and affidavits references to the memorandum, contending that it was subject to the attorney-client privilege and contained double-hearsay. During oral argument on the motion, St. Alphonsus's counsel clarified the requested relief by stating, "[W]e're not trying to preclude the whole document. We want to preclude the references to 'Givens Pursley' and we want to preclude the references to the 'scorched earth.'" In its memorandum decision entered on February 6, 2007, the district court ruled that St. Alphonsus had failed to prove that the memorandum was subject to the attorney-client privilege. The court explained as follows:

> Having reviewed the Shattuck Hammond Memo and the arguments by Saint Alphonsus, the Court is unable to find that Saint Alphonsus has proven the Shattuck Hammond Memo is privileged and therefore any references to the Shattuck Hammond Memo and the Memo itself will not be stricken. Shattuck Hammond was hired by both Givens Pursley and directly by Saint Alphonsus, the Shattuck Hammond Memo was turned over to MRIA by a Shattuck Hammond representative, and there is testimony in the record that the document was prepared by Shattuck Hammond directly for Saint Alphonsus. Additionally, the Court will find the Shattuck Hammond Memo is itself subject to the business records exception.

The court concluded by denying the motion to strike "for purposes of the motions presenting [sic] before the Court, however, this issue can be revisited as discovery in this litigation progresses." Thus, the court did not, by any stretch of the imagination, categorically deny the claim that the memorandum, or parts of it, were covered by the attorney-client privilege. It merely held that St. Alphonsus had failed to prove its claim of attorney-client privilege in connection with its motion to strike, but the matter could be revisited.

On June 5, 2007, St. Alphonsus filed a motion in limine seeking to redact portions of the September Shattuck memorandum. In its supporting memorandum, St. Alphonsus stated that it "now seeks the Court's Order, *in limine*, finding the portions of the Shattuck Hammond Memorandum referring to Givens Pursley LLP's analysis and the 'scorched earth' language is not admissible into evidence at trial and precluding MRIA from referring to Saint Alphonsus' withdrawal from MRIA as the 'scorched earth' scenario or approach." St. Alphonsus contended that the references to Givens Pursley's analysis were protected by the attorney-client privilege and that references to the "scorched earth" scenario were hearsay and prejudicial.

The motion in limine was scheduled for hearing on July 2, 2007, along with 29 other motions in the case. Time for argument was understandably short. St. Alphonsus's counsel began by stating that there were some "sensitive" phrases in the memorandum that should be stricken. The district court asked, "Your argument goes to the – to the author of that and how in any way, shape, or form that can be an admission by – by your folks?" St. Alphonsus's counsel responded, "Yes. I wanted to talk to you sometime about the admissibility – maybe redacting of parts of that memorandum, to excise those parts that we don't think are admissible." He added that "our papers" will reveal "why it is that we believe some of the information in that memorandum is inflammatory, prejudicial, and inadmissible." When MRIA's counsel responded to the motion in limine, he talked solely about the "scorched earth" scenario mentioned in the memorandum, arguing that it was admissible. In rebuttal, St. Alphonsus's counsel talked only about the "scorched earth" statement in the memorandum, arguing that it was hearsay and that there was nothing showing that anyone from St. Alphonsus or its counsel used that phrase. The district court did not announce how it would rule, but took the matter under advisement.

On July 30, 2007, the district court entered its memorandum decision granting the motion in limine. The district court identified the issue as follows: "Saint Alphonsus asks the Court to

17

preclude MRIA from referring to Saint Alphonsus' dissociation from MRIA as the 'scorched earth' scenario and finding portions of the Shattuck Hammond Memorandum inadmissible at trial." It identified what St. Alphonsus wanted stricken as follows:

> The language in dispute is located in a portion of the Memorandum wherein Finnerty and Appleyard provide an overview of the contemplated options apparently being considered by Saint Alphonsus with regard to the non-compete provision contained in the MRIA Articles of Partnership. The Memo reads in relevant part, "SARMC has referred to this as their 'scorched earth scenario.'"

The district court then wrote:

> The Court previously addressed the admissibility of this Shattuck Hammond Memorandum with respect to MRIA's motion for leave to file an amended complaint asserting a claim for punitive damages. Based upon the record before the Court at that time, the Court held the Shattuck Hammond Memo was admissible because Saint Alphonsus had failed to prove the Memo was subject to the attorney-client privilege and because the Memo is itself subject to the business records exception. Memorandum Decision, February 6, 2007.
> Based upon the record presently before the Court, including having reviewed the documents attached to the Affidavit of Jack Gjording dated July 3, 2007, for *in camera* review, the Court can find that the language at issue is not attributable to Saint Alphonsus and therefore the motion in limine will be granted.
> Even assuming the language at issue is subject to exception to the general rule precluding hearsay, the challenged language will be excluded under IRE Rule 403. . . .
> The Court will grant the relief requested by Saint Alphonsus and preclude MRIA from referring to Saint Alphonsus' dissociation from MRIA as the "scorched earth" scenario and require the challenged language be redacted from the Shattuck Hammond Memorandum should the Memo be offered and admitted into evidence at trial.

The district court did not rule on St. Alphonsus's request also to redact references to Givens Pursley's analysis from the memorandum. The court apparently overlooked that portion of the motion because nobody mentioned it or argued attorney-client privilege during oral argument on the motion.

In its reply brief on appeal, St. Alphonsus contends that in the district court's July 30, 2007 decision, it did rule on the issue of attorney-client privilege and rejected it. According to St. Alphonsus:

> On the eve of trial, the court likewise rejected the second motion *in limine* to the extent it was addressed to the claim of attorney-client privilege, stating that it had "previously addressed the admissibility of this Shattuck Hammond

18

Memorandum" and held that it "was admissible because Saint Alphonsus had failed to prove the Memo was subject to the attorney-client privilege."

Again, St. Alphonsus mischaracterizes the record. The portion of the district court's July 30, 2007 decision to which St. Alphonsus refers is quoted above in context. The court's reference to its prior ruling on attorney-client privilege was simply a historical reference, as shown by its introductory statement, "Based upon the record before the Court at that time" before describing its prior ruling holding that St. Alphonsus had failed to establish grounds for deleting references to Givens Pursley and to the "scorched earth" scenario. The court began the next paragraph with the phrase, "Based upon the record presently before the Court," and then ruled that the reference to the "scorched earth" scenario would be stricken. The district court obviously included the reference to its prior ruling in order to explain why it was now ruling that the "scorched earth" reference should be redacted. Immediately following that reference, the district court stated, "The Court will grant the relief requested by Saint Alphonsus . . . ." It did not state that the motion was granted in part and denied in part. The court's focus was entirely upon the "scorched earth" reference probably because that is what was argued in connection with the motion.

After the district court's ruling on this motion in limine, St. Alphonsus filed another motion in limine on August 3, 2007, seeking "an Order, *in limine*, for an Order prohibiting MRIA from using documents produced by Shattuck Hammond Advisors in MRIA's opening statement." Because the district court had not yet ruled conclusively on whether portions of the September Shattuck memorandum should be stricken because they were protected by the attorney-client privilege, St. Alphonsus could have again raised this issue in connection with this motion in limine. It did not do so.

In summary, the district court did not, by any stretch of the imagination, unqualifiedly rule on the issue of whether the memorandum, or parts of it, were covered by the attorney-client privilege. If the trial court unqualifiedly rules on the admissibility of evidence prior to trial, no further objection is necessary in order to preserve the issue for appeal. *Kirk v. Ford Motor Co.*, 141 Idaho 697, 702, 116 P.3d 27, 32 (2005). If the trial court does not do so, however, then the party opposing the evidence must continue to object as the evidence is presented. *Schwan's Sales Enters., Inc. v. Idaho Transp. Dept.*, 142 Idaho 826, 833, 136 P.3d 297, 304 (2006). By failing to object when the memorandum was offered into evidence during the trial, St. Alphonsus

waived any objection. *Gunter v. Murphy's Lounge, LLC*, 141 Idaho 16, 25, 105 P.3d 676, 685 (2005).

St. Alphonsus also contends that it preserved the issue for appeal by raising it in its motion for a new trial. A motion for a new trial is not a retroactive, timely objection to evidence.

**D. Did the District Court Err by Admitting into Evidence a Settlement Offer Made by MRIA?**

MRIA made a settlement offer to St. Alphonsus in a letter dated March 5, 2004. Typed at the top of the letter was the statement, "CONFIDENTIAL SETTLEMENT OFFER MADE PURSUANT TO I.R.E. 408." In that letter, MRIA offered to sell MRI Center and MRI Mobile to St. Alphonsus for a net sum of $23,457,000.

During the trial, MRIA offered the letter into evidence as "a fair market valuation that goes in in the context of negotiations that were initially invited by Saint Alphonsus." St. Alphonsus objected that the letter was not admissible under Rule 408 of the Idaho Rules of Evidence. The district court overruled that objection, stating: "I think that certainly a party can, if they choose to, disclose a – quote, 'an offer of compromise,' if it's for the purpose of demonstrating, 'This is what we believe our company is worth,' and that was communicated to Saint Alphonsus." The court then gave St. Alphonsus a continuing objection regarding the admissibility of the letter.

After ruling that the letter was admissible, the district court gave a limiting instruction to the jury. The court stated:

> Ladies and gentlemen, Exhibit 4332 the court has ruled will be admitted for – for a limited purpose, for the purpose of demonstrating a communication by MRIA to Saint Alphonsus as to their belief or their opinion as to what they felt the fair market of the MRIA partnership was. It does not establish fair market value. It is simply a communication as to their belief as to what they believe the fair market value to be.

The district court erred by admitting the letter into evidence. Rule 408 states:

> Evidence of (1) furnishing, offering, or promising to furnish, or (2) accepting, offering, or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for, invalidity of, or amount of the claim or any other claim. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require

20

the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule does not require exclusion if the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution. Compromise negotiations encompass mediation.

The Rule states that an offer "is not admissible to prove liability for, invalidity of, or amount of the claim or any other claim." The letter was offered to prove liability for and/or the amount of MRIA's claim against St. Alphonsus. The Rule should be given a broad, not narrow, interpretation in order to encourage settlement negotiations. Holding that the offer of settlement was admissible not to show value, but to show that the other MRIA partners really believed their opinion as to value, is a distinction without a difference.

**E. Must the Award of Damages Be Vacated because It Includes Damages Sustained by Nonparties?**

Prior to trial, MRIA filed a motion seeking permission to file a second amended counterclaim and a first amended third-party complaint. It sought to amend its pleading in order to assert claims on behalf of MRI Center and MRI Mobile without making them parties to this lawsuit. The proposed pleading contained twenty claims for relief. The fourth claim for relief alleged that St. Alphonsus breached fiduciary duties owing to MRI Center and MRI Mobile and that "[a]s a result of these breaches of fiduciary duties, MRIA, in the name of MRI [Center] Limited and MRI Mobile Limited, has been damaged in an amount to be proved at trial."

St. Alphonsus objected to the proposed pleading upon the ground that MRIA could not recover damages on behalf of MRI Center and MRI Mobile. In a memorandum filed on January 4, 2007, it argued that MRI Center and MRI Mobile were "distinct legal entities" and there is no authority allowing MRIA to bring a counterclaim on their behalf. In an opinion entered on February 6, 2007, the district court rejected that argument. It reasoned:

> Secondly, based upon the record before the Court, the Court will find that MRIA is able to assert claims on behalf of MRICI and MRIM. Generally, general partners have the authority to bind a limited partnership for actions taken within the ordinary course of business. The partnership agreements of MRICI and MRIM adopt this rationale, and state the general partner [MRIA] "is vested with all authority and responsibility necessary for the management of the Partnership and its business." (Brackets in original.)

21

The jury awarded damages totaling $63.5 million. In response to St. Alphonsus's motion for a new trial, the district court reduced that award to $36.3 million. The court found that the jury had combined alternative theories of damages: the purchase price of MRI Center in 2001 and lost profits. The court reduced the award to $36.3 million in lost profits because that was "the largest amount of damages that the evidence supports." The lost profits included profits lost by both MRI Center and MRI Mobile for past and future MRI scans diverted to Intermountain Imaging. MRIA did not provide any services. Its income came from management fees. MRI Center agreed to pay MRIA a management fee of $90,000 or 7.5% of its cash receipts from operations, whichever was greater. MRI Mobile agreed to pay MRIA a management fee of 7.5% of its cash receipts from operations. In addition, MRIA would receive its share of the net cash flow from the limited partnerships. MRIA's lost profits would be the management fees and its share of the net cash flow from the limited partnerships.

In Instructions 32 and 33, the district court instructed the jury that one of the issues it must determine was whether St. Alphonsus breached the fiduciary duties of loyalty and of care "to MRIA, MRI Center or MRI Mobile" and that if St. Alphonsus breached the duties of loyalty it "owes to MRIA, MRI Center or MRI Mobile, then your verdict should be for MRIA." In Instruction 34, it also instructed the jury that a party had a duty of care in its conduct of "partnership business" and "[i]f you find that Saint Alphonsus has breached the duty of care in regards to the duty Saint Alphonsus owes to MRIA, MRI Center or MRI Mobile, then your verdict should be for MRIA." During the jury instruction conference, St. Alphonsus asked that separate instructions be given regarding the breach of fiduciary duty owing to MRIA and the breach of fiduciary duty, if any, owing to the limited partnerships. The district court refused to do so, stating, "[T]he Court will decline to differentiate between or give separate instructions as to MRIA and then MRI Mobile and MRI Center, the limited liability partnerships." On the special verdict, it asked the jury, "Do you find that Saint Alphonsus breached a fiduciary duty owed to MRIA, MRI Center or MRI Mobile, as described in Instructions Nos. 32, 33, 34 and 35?" The jury answered "Yes" to that question. [10] As the question was phrased in connection

---

[10] On appeal, MRIA argues that all of its claims were asserted on behalf of MRI Center and MRI Mobile. It relies upon the following statement in its pleading:

with the jury instructions on breach of duty, the jury would award damages to MRIA if it found that St. Alphonsus breached a fiduciary duty owed to MRIA or to MRI Center or to MRI Mobile.

St. Alphonsus contends that the damages awarded exceeded the damages incurred by MRIA. It argues on appeal, "Contrary to ordinary practice, the district court allowed MRIA to assert claims 'on behalf of' Center and Mobile without joining these distinct legal entities as parties." It adds:

> No legal authority permitted MRIA, as a general partner, to sue in a representative capacity "on behalf of" the limited partnerships. A limited partnership is a distinct legal entity, with a legal existence separate and apart from its partners, including its general partner. *See* Idaho Code § 53-2-104. Further, a limited partnership has "the power to sue, be sued, and defend in its own name," *id.* § 53-2-105, and limited partnerships routinely do so in the courts of this State, *see, e.g., Brandon Bay, LP* v. *Payette County,* 142 Idaho 681, 132 P.3d 438 (2006). The district court thus erred when it allowed MRIA to proceed "on behalf of" the limited partnerships, without naming those legal entities as distinct parties.

St. Alphonsus is correct. Idaho Code § 53-2-104(1) states, "A limited partnership is an entity distinct from its partners." Idaho Code § 53-2-105 provides, "A limited partnership has the powers to do all things necessary or convenient to carry on its activities, including the power to sue, be sued, and defend in its own name . . . ." "This Court has clearly held that the trial court cannot enter judgment for or against the person who is not a party to the action." *Valentine v. Perry*, 118 Idaho 653, 655-56, 798 P.2d 935, 937-38 (1990). The limited partnerships were not parties to this action. They therefore could not recover a judgment. Although MRIA, as the general partner, had the right to manage and conduct the activities of the limited partnerships, I.C. § 53-2-406(1), and would have the power to join the limited partnerships in a lawsuit, there

---

MRI Associates, LLP is an Idaho limited liability partnership ("MRIA"), which also acted as a general partner with management responsibilities for two operational entities, MRI Limited Partnership, known as MRI Center of Idaho ("MRI Center" or the "Center"), and MRI Mobile Limited Partnership, known as MRI Mobile. MRIA brings this action on its own behalf, and as general partner for these operational entities; MRIA is entitled to and does hereby bring this action on behalf of these two limited partnerships. Unless otherwise referenced, the designation "MRIA" shall refer to all three entities: MRIA, MRI Center and MRI Mobile.

Because it did not "otherwise reference" that "MRIA" did not include the limited partnerships in any of its claims except the fourth cause of action seeking damages for breach of fiduciary duty to the limited partnerships, MRIA is technically correct that all of its claims were asserted on behalf of the limited partnerships. However, the only mention of MRI Center and MRI Mobile in the jury instructions outlining the causes of action submitted to the jury was in connection with the breach of fiduciary duty claim. That was also the only claim in which the limited partnerships were mentioned on the special verdict form. Thus, the jury would not have known that MRIA was asserting all of the claims on behalf of the limited partnerships too.

is a difference between having the power to have the limited partnerships join in this lawsuit and actually doing so. Because the damage award exceeded any damages suffered by MRIA and because MRIA could not recover damages on behalf of nonparties, the damage award must be vacated.

**F. Must the Award of Damages Be Vacated because It Includes Lost Profits beyond the Term of the Partnership?**

St. Alphonsus contends that the district judge erred by permitting MRIA to recover damages based upon MRI scans that MRI Center would have lost after December 31, 2015, the date stated in the limited partnership agreement for the expiration of its term. The partnership agreement provides, "This Agreement may be amended only through written instrument executed by the General Partner and the Limited Partners owning 75% of the outstanding Units." St. Alphonsus asserts that there is no evidence of any written amendment extending the term of the MRI Center limited partnership.

Although we will be remanding this case for a new trial, as mentioned above, MRIA's damages could include the amount it is entitled to receive as a portion of MRI Center's income. We will address this issue because it may arise again on retrial.

Idaho Code § 53-2-110(1) provides that "the partnership agreement governs relations among the partners and between the partners and the partnership." The limited partnership agreement for MRI Center provides that it can only be amended through a properly executed written instrument. The Comment to the Official Text for Idaho Code § 53-2-110 states, "The partnership agreement has the power to control the manner of its own amendment. In particular, a provision of the agreement prohibiting oral modifications is enforceable, despite any common law antagonism to 'no oral modification' provisions." There was no properly executed written instrument extending the term of the MRI Center limited partnership beyond December 31, 2015.

**G. Must the Award of Damages Be Vacated because There Was Insufficient Evidence to Support the Award of Lost Profits?**

The lost profits evidence offered by MRIA was based upon "lost scans." MRIA's expert determined which physicians referred patients to MRI Center and/or MRI Mobile prior to

Intermountain Imaging opening. He assumed that all MRI scans later performed at Intermountain Imaging for patients of those physicians would have been done at MRI Center and/or MRI Mobile but for St. Alphonsus's wrongful conduct. He also assumed that all physicians who were admitted to St. Alphonsus only and who had not previously referred patients to MRIA prior to Intermountain Imaging opening would have referred all of their patients needing MRI scans to MRI Center and/or MRI Mobile but for St. Alphonsus's wrongful conduct. This assumption as to MRIA's lost scans was the basis for the past and future lost profits allegedly suffered by MRI Center and MRI Mobile. St. Alphonsus argues that MRIA could not simply assume that after Intermountain Imaging opened, none of those physicians would have referred patients to Intermountain Imaging for MRI scans but for St. Alphonsus's wrongful conduct. Although we will be remanding this case for a new trial, we will briefly address this issue because it may arise again on retrial.

In *Pope v. Intermountain Gas Co.*, 103 Idaho 217, 646 P.2d 988 (1982), the trial court found that Intermountain Gas was liable for antitrust violations committed by it and its wholly owned subsidiary Intermountain Gas Company Properties (IGCP) when operating an insulation business under the name HomeGuard. In calculating damages, the trial court assumed that the insulation jobs done by Intermountain Gas and IGCP would have all have been done by their competitors but for the antitrust violations. It therefore calculated the damages suffered by the competitors based upon Intermountain Gas's and IGCP's gross sales figures for those jobs. In reversing, this Court held that this was not a proper manner to measure the competitors' lost profits. We held:

> [T]here was no justification in the present case for the trial court's determination that the gross revenues of the defendant Intermountain Gas Company and IGCP provide a reasonable foundation for calculating the lost profits of plaintiffs. Such a method of figuring damages assumes, without any support in the record, that the HomeGuard operation would not have won any portion of the insulation market absent antitrust violations. Furthermore, it assumes that the plaintiffs had the capacity to assimilate all of the business which HomeGuard performed, and that plaintiffs would have won that business over other insulators who chose not to participate in this action. There is simply no evidence in the record to demonstrate a relationship between HomeGuard's sales figures and plaintiffs' damages so as to support a conclusion that HomeGuard's income was the equivalent of plaintiffs' lost profits.

The concerns expressed in *Pope* should be considered on any retrial.

25

**H. Does the Evidence Support an Award of Damages Based upon the Value of MRI Center?**

MRIA's alternative measure of damages was the sum St. Alphonsus would have had to pay to purchase MRI Center. According to MRIA, this was an appropriate measure of damages because

> it was shown that since 1999, SARMC [St. Alphonsus] had been advised by its consultants that if it wished to exit MRIA, partner with the radiologists and pursue imaging opportunities in its service area, the lawful approach would be to buy its way out of the partnership (and the noncompete provision which was part and parcel of the partnership) and purchase 100% of MRICI [MRI Center] from MRIA.

The advice St. Alphonsus received from its consultants does not determine the measure of damages. This is not an action for breach of a contract to purchase MRI Center. The cost to purchase MRI Center is not the measure of damages suffered by MRIA on any of the alleged causes of action. Thus, the jury's alternative award of damages cannot be reinstated.

**I. Did the District Court Err in Denying MRIA's Motion to Amend to Add a Claim for Punitive Damages?**

MRIA sought to amend its pleading to add a claim against St. Alphonsus for punitive damages. It cross-appeals the district court's denial of that motion.

To recover punitive damages, "the claimant must prove, by clear and convincing evidence, oppressive, fraudulent, malicious or outrageous conduct by the party against whom the claim for punitive damages is asserted." Idaho Code § 6-1604(1). "Punitive damages are not favored in the law and should be awarded in only the most unusual and compelling circumstances." *Seiniger Law Office, P.A. v. North Pacific Ins. Co.*, 145 Idaho 241, 249, 178 P.3d 606, 614 (2008). A claim for punitive damages cannot be asserted in the claimant's pleading without the approval of the trial court. The claimant must make a pretrial motion, and, after a hearing, the trial court must conclude that the claimant has established a reasonable likelihood of proving facts sufficient to support an award of punitive damages. I.C. § 6-1604(2).

A trial court's determination that a plaintiff is not entitled to amend the complaint to claim punitive damages is reviewed for abuse of discretion. *Seiniger*, 145 Idaho at 250, 178 P.3d

at 615.  In determining whether the trial court abused its discretion in denying a motion to add a claim for punitive damages, we consider:  (1) whether the judge correctly perceived that the issue was one of discretion; (2) whether the judge acted within the outer boundaries of that discretion and consistently with the applicable legal standards; and (3) whether the judge reached the decision through an exercise of reason.  *Id.*

In this case, the district court issued a lengthy, well-reasoned opinion explaining the reasons for its decision to deny MRIA's motion to add a claim for punitive damages.  The court found that there was a lack of evidence of oppressive, fraudulent, malicious or outrageous conduct on the part of St. Alphonsus.  MRIA has not shown that the district court abused its discretion in making that determination.[11]

## J.  Did the District Court Err in Dismissing MRIA's Antitrust Cause of Action?

MRIA alleged an antitrust claim against St. Alphonsus, based upon its partnership with Intermountain Imaging.  The district court dismissed that claim on St. Alphonsus's motion for summary judgment.  MRIA has cross-appealed that decision.  It argues on appeal that there was sufficient evidence in the record to show that Intermountain Imaging was exercising monopoly power. MRIA relies upon statements by its expert that Intermountain Imaging receives approximately 5% more for its services than other MRI providers in the market area and that Intermountain Imaging's market share "increased from approximately 21 to 23 percent in 2001 to approximately 44 to 53 percent in 2006."  Because this cause of action was dismissed on summary judgment, we must accept as true these factual allegations.  *Stanley v. Lennox Indus., Inc.*, 140 Idaho 785, 789, 102 P.3d 1104, 1108 (2004).  The expert's opinions were based upon his analysis of the claims for non-hospital MRI scans paid by Blue Cross of Idaho Health Services, Inc., and Blue Shield of Idaho Health Services, Inc., at MRI facilities in Ada and Canyon Counties, Idaho, and Ontario, Oregon, and the records of Practice Management, Inc., of MRI scans provided by Intermountain Imaging.

In *Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004), the United States Supreme Court set forth what must be shown to establish an offense of monopolizing or attempting to monopolize in violation of section 2 of the Sherman Act.  First,

---

[11] MRIA also contends that the district court erred in denying its motion to add a claim for punitive damages made after the close of the evidence.  Idaho Code § 6-1604(2) requires a pretrial motion.

the Court stated, "It is settled law that this offense requires, in addition to the possession of monopoly power in the relevant market, 'the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" 540 U.S. at 407 (quoting from *United States v. Grinnell Corp.*, 384 U.S. 563 (1966)). Merely growing in market share does not violate the Sherman Act. MRIA's expert did not attempt to analyze whether there were any differences among providers that would account for Intermountain Imaging's alleged growth in market share.

Second, the Court stated, "The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system." *Id*. It added, "The opportunity to charge monopoly prices-at least for a short period-is what attracts 'business acumen' in the first place; it induces risk taking that produces innovation and economic growth." *Id*. Thus, the alleged fact that Intermountain Imaging is receiving about 5% more for its services than the market average does not show a violation of the Sherman Act. Again, MRIA's expert did not attempt to analyze whether there were any quality-based or service-based differences that could account for the allegation that Intermountain Imaging receives higher than average compensation for its services. He simply stated that he was unaware of any such differences. He assumed that if the Current Procedural Terminology codes were the same, the particular services provided were identical.

Finally, the Court stated, "To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*." *Id*. (emphasis theirs). MRIA does not contend that Intermountain Imaging has engaged in predatory pricing. Likewise, it does not contend that anticompetitive conduct is shown by the fact that St. Alphonsus is a partner in Intermountain Imaging. Indeed, it would be difficult for MRIA to argue that St. Alphonsus being a member of Intermountain Imaging is anticompetitive conduct, but St. Alphonsus being a partner in MRIA would not be. In addition, MRIA's expert had not done any analysis to determine whether MRIA was actually damaged by Intermountain Imaging's alleged anticompetitive conduct, nor had he done any analysis to determine whether such alleged conduct had any effect upon market share. He also did not attempt to determine whether the number of MRI scan providers in the relevant market had increased or decreased over the prior five years. St. Alphonsus offered evidence that they had increased. MRIA cannot show anticompetitive conduct merely from its allegation that it was

28

wrongful for St. Alphonsus to have joined the Intermountain Imaging partnership in the first place. *Id*. at 408.

The supposed anticompetitive conduct listed in MRIA's brief consisted of St. Alphonsus allegedly disparaging MRIA's services, directing patients to Intermountain Imaging in violation of a non-antitrust law, and failing to cooperate with MRIA. MRIA does not present any authority stating that any of that alleged conduct constitutes anticompetitive conduct. Generally, failing to assist or cooperate with a rival is not anticompetitive conduct. *Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 408-09 (2004). Although there are very limited circumstances in which it can be, *id.*, MRIA has not argued that those circumstances apply in this case. "[T]he antitrust laws do not require the courts to protect small businesses from the loss of profits due to continued competition, but only against the loss of profits from practices forbidden by the antitrust laws." *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 116 (1986). The district court did not err in dismissing the antitrust claim.

Finally, MRIA contends that "[t]he trial court's summary judgment ruling was also in error because it ignores this Court's decision in *Twin Falls Farm & City Distributing, Inc.* v. *D & B Supply Co.,* 96 Idaho 351, 528 P.2d 1286 (1974)." The two statutes upon which that case was based were repealed in 2000. Ch. 148, § 1, 2000 Idaho Sess. Laws 377.[12] MRIA has not pointed to any conduct occurring prior to the repeal of those statutes that would constitute a violation of them.

## K.  Is Either Party Entitled to an Award of Attorney Fees on Appeal?

Both St. Alphonsus and MRIA request an award of attorney fees on appeal pursuant to Idaho Code § 12-120(3). Because we are vacating the judgment and remanding this case, there is not yet a prevailing party. Once there is a final judgment, the district court can consider attorney fees incurred on appeal in making its award of a reasonable attorney fee to the

---

[12] One of the statutes, former Idaho Code § 48-101, provided, "Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade of commerce, within this state, is hereby declared to be illegal." When former section 48-101 was repealed, the legislature enacted new Idaho Code § 48-104, which provides, "A contract, combination, or conspiracy between two (2) or more persons in unreasonable restraint of Idaho commerce is unlawful." Ch. 148, § 3, 2000 Idaho Sess. Laws 377, 378. The new statute adds the word "unreasonable" to modify restraint, so that its application is narrower than former section 48-101. The other statute, former Idaho Code § 48-104, was repealed and no similar statute was enacted in its place.

prevailing party.  *Lexington Heights Dev., LLC v. Crandlemire*, 140 Idaho 276, 287, 92 P.3d 526, 537 (2004).


## IV.  CONCLUSION

We vacate the judgment and verdict and remand this case for further proceedings that are consistent with this opinion.  We award costs on appeal to appellant.


Justices BURDICK, J. JONES, HORTON and Justice Pro Tem KIDWELL **CONCUR**.


**On Denial of Petition for Rehearing – January 12, 2010**


EISMANN, Chief Justice


MRIA has filed a petition for rehearing asking the Court to reconsider the award of costs on appeal.  MRIA raises three arguments in support of its motion for reconsideration.

First, it quotes this Court's statement in the opinion that because this Court was "vacating the judgment and remanding this case, *there is not yet a prevailing party*."  (Emphasis added by MRIA.)  MRIA argues, "This finding accordingly precludes an award of costs to either party as a matter of law."

The portion of this Court's opinion quoted by MRIA was addressing the parties' requests for an award of attorney fees pursuant to Idaho Code § 12-120(3).  That statute provides that the prevailing party in certain types of civil actions is entitled to an award of a reasonable attorney's fee.  A prerequisite to an award of attorney fees under that statute is that the party prevail in the "civil action."  In *Paloukos v. Intermountain Chevrolet Co*., 99 Idaho 740, 588 P.2d 939 (1978), this Court for the first time addressed the issue of awarding attorney fees under Idaho Code § 12-120(3) to a party who had prevailed on appeal, but may not prevail in the action after remand to the district court.  This Court held:

> Although Paloukos was successful, in part at least, on this appeal, it nonetheless remains to be determined whether he will ultimately prevail on his cause of action for breach of contract.  Should Paloukos ultimately prevail and satisfy the other requirements of I.C. § 12-120 for an award of attorney fees, the district court, in fixing the award, should of course consider the fees incurred in bringing this appeal.

*Id.* at 746, 588 P.2d at 945. Thus, in the instant case, we held: "Both St. Alphonsus and MRIA request an award of attorney fees on appeal pursuant to Idaho Code § 12-120(3). Because we are vacating the judgment and remanding this case, there is not yet a prevailing party."

The holding in *Paloukos* does not apply to the awarding of costs on appeal because costs on appeal are awarded to the prevailing party on the appeal, not the prevailing party in the civil action. I.C. § 12-107; I.A.R. 40. Therefore, costs can be awarded to the prevailing party on the appeal, even though that party may not ultimately be the prevailing party in the action. *Mendenhall v. Aldous*, 146 Idaho 434, 438, 196 P.3d 352, 356 (2008); *Todd v. Sullivan Constr. LLC*, 146 Idaho 118, 126-27, 191 P.3d 196, 204-05 (2008).

Second, MRIA contends it would be inequitable to award costs against it on appeal. When a new trial has been ordered or a judgment has been modified, this Court has discretion not to award costs on appeal. I.C. § 12-107. The costs claimed by St. Alphonsus total $426,944.75, and include $414,602.00 for the premiums of a supersedeas bond to prevent MRIA from executing on its judgment. MRIA contends that it lacks the money to pay such costs. Had MRIA agreed not to execute pending the appeal, St. Alphonsus would not have been entitled to recover the cost of the supersedeas bond. I.A.R. 40(b)(5). MRIA did not do so. It contends that it was concerned that Saint Alphonsus would simply bankrupt its wholly-owned subsidiary, Saint Alphonsus Diversified Care, Inc., rather than pay the judgment. However, the judgment was against both St. Alphonsus and its subsidiary. MRIA also states that it was concerned that St. Alphonsus "might advance arguments in the appeal that, if successful, might overturn the judgment as against it alone, leaving the entire amount for SADC to pay if MRIA was successful on appeal." MRIA does not state what those arguments may have been, nor has it cited to anything in the record indicating that St. Alphonsus ever asserted that its subsidiary was solely liable for MRIA's claims. The jury was not asked to decide whether St. Alphonsus was liable for the conduct of its subsidiary. The subsidiary was not even on the special verdict form. All of the questions were directed to the conduct of St. Alphonsus. MRIA has not shown that the lack of a bond would have put at risk MRIA's ability to obtain payment of its judgment, had it been upheld on appeal.

MRIA also contends that it did nothing wrong and should not be assessed $426,944.75 for the trial court's errors. These errors were the result of the trial court agreeing with arguments

31

made by MRIA. MRIA has not shown that it would be inequitable to assess costs on appeal against it.

Finally, MRIA argues that there was no prevailing party on appeal because both parties prevailed in part. MRIA states that its position "carried the day on the issue of whether the jury should have considered whether the partnership agreement contained a definite term," and "it also obtained a favorable ruling from the Court concerning a key piece of evidence." Actually, this Court did not rule on the merits of either issue because St. Alphonsus had failed either to obtain rulings from the district court on the issues or to object at trial. See Parts III.B. and III.C. of the opinion. MRIA adds that "the result of two other important issues can best be described as a draw." It did not identify these two "important issues" other than by stating the pages on which they were addressed. They were apparently the issue regarding evidence of lost profits discussed in Part III.G of the opinion and attorney fees on appeal discussed in Part III.K. As to the first issue, we admonished the trial court to consider our holding in *Pope v. Intermountain Gas Co.*, 103 Idaho 217, 234, 646 P.2d 988, 1005 (1982), on any retrial. As to the second, we merely held that the district court can consider attorney fees incurred on appeal in making its award of a reasonable attorney fee to the prevailing party.

St. Alphonsus appealed the judgment against it for $33,872,677.63 (after offsets and an award of costs and attorney fees) and obtained a ruling vacating that judgment. MRIA cross-appealed and lost on all issues raised by its cross-appeal. St. Alphonsus was the prevailing party on this appeal.

For the above reasons, we deny the petition for rehearing asking that we not award St. Alphonsus costs on appeal.


Justices BURDICK, HORTON and Justice Pro Tem KIDWELL **CONCUR**.


J. JONES, J., specially concurring.

I fully concur in the Court's opinion regarding the denial of MRIA's petition for rehearing. It is unfortunate for MRIA that it may have to shoulder the burden of a large cost award relating to the appeal. About 97% of St. Alphonsus' cost claim is for the supersedeas bond. Because of the large amount of the jury award, the substantial number of contested issues, and the slight possibility that any judgment would prove uncollectible, it would have been

prudent for MRIA to agree to forego collection procedures pending a decision on the appeal. Now the shoe is on the other foot. MRIA contends that an award of this magnitude will inhibit its ability to pursue its claim against St. Alphonsus. Nothing this Court has said indicates that St. Alphonsus may not have engaged in actionable conduct. The jury certainly concluded that it had. While one may not predict what the outcome will be on retrial, based on the evidence in the record it may well be that St. Alphonsus is ultimately called upon to compensate MRIA in some significant amount. Therefore, rather than reciprocating and pursuing hardball tactics against MRIA on collection of any cost award that may result from the appeal, St. Alphonsus might be advised to consider withholding collection proceedings pending the ultimate outcome of the litigation.